Good morning, Your Honor. My name is Howard Davis. May it please the Court, I present the petitioner, Ephraim Abraham. And I see I have 15 minutes, so I'd like to reserve it. And if you could turn the volume up just a little bit, I'd appreciate it. Thank you, Your Honor. It will help your cause, I'll put it that way. I'd like to, I'm representing the petitioner, Ephraim Abraham. I have about 15 minutes. I see I'd like to reserve about five for reversal. You may do so, but just watch the clock, counsel. Yes. This case is an asylum case. There was no adverse credibility finding, and it's primarily about nexus. And the reversal in this particular case is compelled. And I believe that one way to help us to think about this is the use of the case, DENU. And actually, DENU is helpful. And one of the ways in which it's helpful is that not so much about the results here with, I mean, that's neither here nor there, but that it provides a principled discussion about looking at these types of cases where an asylum, which overlaps with the possibility of criminal investigation and security concerns overlapping with the question of what's persecution. And in this particular case, that is one of the things that actually is troubling and sorely lacking in the immigration judge's decision. And the thing about DENU is that it involves a specific, that there has to be a specific criminal investigation or some sort of specific thing in mind that's going on, and that the authorities are attempting to find evidence of specific criminal activity. And in DENU's case, it had to do with the civilians during the revolution in Romania during the period of the overthrow of Ceausescu. In that particular case, there was nothing in the record to show that the authorities had imputed any kind of political opinion to DENU. There is nothing like this in this particular case. Are you relying on Judge Thomas' dissent in DENU? Because DENU held the opposite, didn't it? Well, but actually, but what I'm looking at at DENU here is from a principled discussion. Obviously, the results, and I'm not so much relying on his dissent. I'm looking at the principled discussion here. And that helps us to provide limitations. And that is one thing, actually, that the judge in the instant case did not have. Under his approach, it's like nobody gets it. And what I like about DENU is that it provides a principled discussion. And just as the facts, of course, are different here. And in fact, nothing is like that here. The judge, in this case, pointed to no specific criminal activity. He merely pointed to general the relationship between the OLF and the government. But when you look at what goes on in the testimony and the declaration, and the judge believed everything, what we show here is that the government was interested in the fact that the petitioner was an OLF member. They asked about his own activities and the whereabouts of other OLF members. And in the process of doing so, he is subjected to beatings. He was forced to kneel and walk on rough grounds. The conditions were poor conditions. And at the very end of it, they say, in fact, it's where the judge is incorrect. They didn't think that he was not a problem. They just said, we'll call you for potential, if we need you. And then they warned him that, and this is in the declaration, that he's not to participate in any OLF type activities. So this, to me, seems like a typical mixed motive case. One of the motives was his political opinion, and there were other motives, too. That doesn't really matter, because your client is entitled to the benefit, even if the political motive was only one of the motives. I didn't say that very well. But, and actually, that was actually, that sort of leads into sort of the next point. The thing is, is that, and this is something that the judge, in his rush to his opinions about the wisdom of the OLF and all that, didn't even look at that. And that was brief. That was brought up on appeal. That was, and it was mentioned in the briefs here, that the judge didn't even look at that possibility. And if we're looking in terms of what the court should be doing here, actually, it could be rather modest. There were just a number of things that were really not developed below, and the board didn't help. Let me see if I understand your argument, counsel. The brief that was filed, you didn't file the brief. Somebody else filed the brief here. Is that right? The opening and the reply. Yeah, I'm just, I'm here for oral argument. All right. The brief seemed to argue this was an NDOM case. I'm not even sure if that's pronounced correctly. N-D-O-M, N-DOM, which is a mixed motive case. Well, and actually, and that was going to be another point, is that DENU, something like DENU can talk, can set principles. But of course, this does fit within NDOM. I'm sure it's helpful, but at the moment, I'm not sure whether it is more helpful to the government than it is to you. But I'm not, again, I'm not talking about, I'm not talking about outcome. I'm just talking about principle discussion of what, what it is. And in fact, this, in fact, in DENU itself, it says they distinguish DENU or the facts in DENU from a case like Hernandez-Ortiz, where it says where the only plausible explanation for the multiple incidents of violence against petitioner family was imputed opposition to the government. And in that, and under DENU, this case fits within NDOM, and this fits within Hernandez-Ortiz. And, and, and that's to clarify that point here. So that, that's really what I'm saying. So if I understand your argument correctly, your, your first position is that the torture that he suffered was because of his political position, opinion. But as a fallback, even if there were also other reasons unrelated to his membership or his viewpoint, that doesn't matter to the outcome from your perspective. Yes. And that, and that it's mixed motive. And, and unfortunately, these things were not, these, the, the board did not really deal with these very well. The board just affirmed without opinion. And so I don't think that the agency, the So if nothing else, the court should, again, in the spirit of Ventura, remand for developing that aspect of the record. And, you know, the, and the, the court, the, the judge really did not, the other thing the judge didn't look at is, is that, what I like is the, the kind of analysis in Songha, which kind of bifurcates things. The judge did not look also at exactly what it was that specifically happened to to the petitioner. And so it would also have to be looked at, at the first instance, and whether, assuming annexes, whether whatever it is that happened to him amounted to past persecution or torture. The other thing is, is that the, another troubling aspect of this case is the way that the immigration judge used the record. And and I'm not even talking about so much the OLF communiques that are in the record. But, in fact, the, the stuff that is very helpful to the respond, to the petitioner that's in the Department of State reports. Because it's actually much more even-handed than the immigration judge, who just focuses on events that happened in 1995 surrounding the election. And and instead, what, what happened with the, with the petitioner occurred in 1992, at very much at the beginning of the transitional government of Ethiopia. And one thing that the judge made a mistake on is, is that referred to the EPRDF as a coalition of opposition parties. No. I mean, EPRDF and the OLF were two members of the ruling original TGE. And and, and in 1992, as a result of tensions between these two warring factions, that's when the OLF left the coalition. And that's when, in this period of time, where ultimately EPRDF captures a lot of OLF soldiers and include, and many others who are not specifically soldiers like the petitioner here, who was not a soldier. And it was very clear that he wasn't in the rec, that he wasn't still on the record. And he's held for five months in prison. So it, it, the OLF, as the judge comes to understand it, is, and, and warring against the government, it's talked about in 1995. But really, the incidents are happening in 1992, where it's a little more fluid situation. And the other thing that, you know, when the judge was talking about the, that there was an Oromo president that was elected in 1995, but the record is clear is that the president is not the one with the power. The, the one with that, in which really the true power relies, and here's in the prime minister. And the prime minister, Melissa Nowey, is the head of the TPLF, the Tigray People's Liberation Front, which is the dominating member of the EPRDF. And he was also the president of the, under the TGE. Counsel, are you pursuing the cat claim? I noticed that you just mentioned it very, or at least the brief just touched on it very briefly, and the reply brief doesn't mention it at all. I mean, the, the, the, yeah, and actually that was going to be my, sort of my last point here, is, is that the, I don't think that the petitioners waive the cat claim. I, first of all, it, with, with regard to the opening brief, it, certainly it could have been a much broader discussion, but it, it is, it is in the same section that talks about the withholding of removal. And there is reference, it, it's, there is, it's basically sort of shorthand reference to, you know, what occurred earlier in the argument. And, and with regard to the record below, yes, initially the, at, at the master calendar, which was a very unusual kind of situation there, where the judge just said, well, you know, asylum, withholding stronger cases, we won't go with the cat, which I find as a practitioner does it rather unusual. But nonetheless, ultimately the, the judge in his, in 2003, when it came back, said that, you know, he's going to be ruling on the cat claim and recognizing that maybe originally the, the respondent, the petitioner didn't ask for it. And nobody had any problem. The government didn't, didn't object to it. And certainly the. So if there had been an earlier waiver at the second hearing, they waived the waiver by allowing it to be dealt with on the merits. Yes. So unless there are any other questions. Not at the moment, counsel. Okay. We'll hear from the government. Good morning. May it please the court. Nairi Simonian on behalf of the attorney general, Michael Mukasey. Counselor, could we ask you again to raise your voice a little bit, if you wouldn't mind. Nairi Simonian on behalf of the government. Keep coming. Shout at us. There was a lot of questions going back and forth. I'm going to try to attempt to answer some of these questions for you. Well, how do you read Dinu? You heard the colloquy. What, what's your take on it? Well, first of all, petitioner relied on Ndom in both his supplemental brief and his original brief. And our case is actually much more like Dinu for the following reasons. Dinu was a part of the military. Now, he says Dinu cuts for him. The principle established in Dinu sets the stage here and distinguishes this case from Dinu. Right. And I'd argue that Dinu is actually supportive for the government for the following reasons. Dinu was a member of the military and the killings of civilians were occurring by the military, which is why suspicion fell upon the military. You could say a political group or a social group. And Dinu was therefore taken in to investigate a criminal activity. The court found that as long as the police were trying to find evidence of this criminal activity, either the length of the investigation or the fact that they were pursuing suspects they believed to be innocent or unsavoriness of practice, they rise to the inference of political prosecution. Again, here comparing our case. Well, let me ask you specifically about this case because assuming there might have been other motives as well, I don't understand how you could read this record to exclude a nexus to political opinion. He testified that he was repeatedly questioned about the identity of, what is it, OLF members and about their activities and during the time he was tortured at the police station and so forth. I don't see how you can escape because he was deemed credible. I don't know how you can escape the conclusion that his political opinion or imputed political opinion was at least one of the motivations. I understand the inclination to believe that, but. I'm just reading the record. And his credible testimony that that's what they were doing, asking him about while they tortured him. They were taking in OLF members who were trying to violently overthrow the government. They weren't taking in just political members because they were politically involved with the OLF. He actually did testify that the government detains you if you are a suspect. He says, I was assisting the OLF fighters monetarily, so they would have a suspicion that he was involved in the violence. He also testified that I didn't know if everyone was in fact detained were OLF members. Well, I guess what it looks like to me, just reading this record and deeming him to be credible, is that there were two things going on. One was a belief that he held certain political views and that they were beating him up because of that. And also they thought he was a troublemaker and they were detaining him potentially for other reasons as well. But that doesn't negate, it seems to me, the political aspect of it. I'd argue that the Ethiopian government was not using his political opinion as a pretext for the criminal investigation, as a pretext for suppressing. It doesn't have to be a pretext. They can have two reasons. They can have a legitimate reason and a political reason. And he would still win if his politics is one of the reasons. Well, he also loses because, as the IJ correctly pointed out, the incidents which occurred to him didn't amount to a past persecution. He vaguely testified that he was beaten and tortured. You're correct in stating that. And sometimes that he was beaten and tortured enough so he couldn't walk. He indicates that he was forced to walk on a rough place and was harassed. And, of course, there's case law indicating that harassment was not persecution. He says that while he was detained, he had to dig and cut and collect firewood. I mean, the general terms beaten and tortured can be thrown around, but that doesn't. He was believed, though. Remember, he was believed. He was credible. He was believed, but the IJ did point out that it did not rise to the level of past persecution, the incidents which did occur to him. That's a conclusion, but that's not a fact. That's a legal conclusion, right? Right. I mean, I'm pointing to the record to indicate that, you know, these incidents do not, I mean, going to a Ninth Circuit case law, do not support a finding of past persecution. Detainment alone and harassment are not past persecution. And, again, I go back that these were not because he was on account of his political opinion. If I can just point to another section of his testimony where he says, I was first arrested and taken in with fellow OLF members and released shortly thereafter. In actually Fisher, there was a finding of no past persecution where the alien failed to show that the government selectively enforced its regulations against her. It's obvious that the government wasn't selectively enforcing their regulations against Mr. Abraham. I understand that it appears that they were just rounding up these OLF members, but during a time of transitional government in Ethiopia, it was maybe not the way that we would go about investigating a crime, but it was the best way they could sort of handle the violent overthrow of their government. And the State Department reports actually do support that and contradict mostly everything that Mr. Abraham has testified to. If I can go ahead and cite to some of the record evidence. Well, I guess I'm not sure why that is helpful to you since he was deemed to be credible. There are certainly parts of the reports that are supportive of his testimony. The IJ found him credible saying, I believe that he was probably detained by the government. But there's no adverse credibility finding, right? Right. And under our case law, that means that we have to take all of his statements as true. Right. Okay. But they're still not, I mean, what he testifies to is not what was going on in Ethiopia at the time. Now, wait a minute. I don't understand that. If we assume that his statements are credible, how can we entertain that idea? Credible in terms of what he did testify to. He said he was detained and the IJ did agree that he believes during the transition of the Ethiopian government, he was detained. He was probably taken and in question because they were trying to find these OLF criminal members. He testified that he was held for five months in inhumane conditions where there was no bathroom, where he was forced to walk on his knees, where he couldn't walk because of what they did to his feet, and various other things. That's a given in this case. Why isn't that past persecution? It's not past persecution because it wasn't on account of his political opinion. Well, that goes back to the other. We're on a different topic. We dealt with that topic. Now we're on assuming that it's because of his political opinion. Why isn't that past persecution on account of whatever it's on account of? Right. It's unfortunate, and I am sympathetic to what happened to him. But according to the circuit's case law, you know, being just detained in a dark, dirty place as he testifies in the record. He testified to more than that, though. I mean, it seems like you're looking at the record quite selectively and not at the things where he said that his feet were tortured so he couldn't walk or where he had to walk on his knees and things like that, where he is pretty specific about things that happened to him during that five-month period. Well, establishing that, I mean, the State Department, of course, supports that he does not have a well-founded fear of persecution. Let me ask you about the cat claim, really, before you run out of time. You do make the assertion that he waived that, and in the opening brief, the whole brief is only 14 pages long or something like that, and there are at least three references to the cat claim, by my reckoning, on pages 3, 5, and then again on 14, where he has a cursory but some analysis explaining why his cat claim should be granted. You know, it's not a great brief, with apologies to Petitioner's Council, but it does raise the cat issue, so why should we deem it to be waived? Well, even stating, as it was already discussed, he did waive it in immigration proceedings. You say he did waive it in immigration proceedings? Yes. Where did he do that? The record indicates 132 and 140. Was that before the final hearing? Yes. Okay, and at the final hearing, the cat claim was dealt with on the merits, right? Because the IJ makes a decision about the cat claim, where he conflates it with the other kinds of claims. He doesn't analyze it separately. But he does make a substantive decision, right? Right. Yes, but also Petitioner's brief just states peripherally, as you mentioned, that the cat claim should be considered. And, you know, we've held that the peripheral, or just stating one line in a brief isn't sufficient in order to address a claim. Thank you. Anything further, Counsel? I'd just like to, if I may, close and sum up. Certainly. Okay. Again, I'd like to point out that the IJ correctly found that Mr. Abraham was not persecuted on account of his political opinion and, in fact, was detained for a legitimate criminal investigation by the Ethiopian government. Mr. Abraham also failed to establish that he has a well-founded fear of persecution in Ethiopia, particularly given the State Department country conditions, which demonstrate that OFL members are not persecuted and that they have actually taken on prominent positions in the government. I thank you. Thank you, Counsel. Counsel, Mr. Davis, you have some reserve time. First of all, with regard to the cat claim, just referring to the record. A little louder again. I'm sorry to have to remind you, Counsel. At 71 and 72, with regard to the cat claim, and this is where the judge at the final hearing in 2003 brings up the cat claim and the government had no problems with that. That is with the judge making a decision on that. There was no objection. With regard to, you know, to the future persecution, again, the State Department reports does talk about that generally the human rights situation in Ethiopia is poor. And while they may try to make some improvements here and there, but really the grade is that it's poor. And unless there are any other questions, I'll submit. No further questions. Thank you. Thank you, Counsel. The case just argued will be submitted for decision.
judges: Gibson , O'scannlain, Graber